Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 CR 280 | **DATE** | 2/1/2001 |
| **CASE TITLE** | USA vs. Ricardo Rivera | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Order. Rivera's motion for reduction of his term of imprisonment is denied. (167-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 0 2 2001 | |
| | Notified counsel by telephone. | | date docketed | 168 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2/1/2001 | |
| SN | courtroom deputy's initials | 01 FEB -1 PM 3:48 | date mailed notice SN | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
    v.                             )   No. 94 CR 280-1
                                   )
RICARDO RIVERA,                    )
                                   )
              Defendant.           )

MEMORANDUM ORDER

Ricardo Rivera ("Rivera") has filed a self-prepared motion for reduction of his term of imprisonment in attempted reliance on 18 U.S.C. § 3582(c)(2), which deals with situations in which the Sentencing Commission has lowered the sentencing range pursuant to which a defendant was sentenced and is serving that sentence. Because Rivera operates from a mistaken premise, his motion is denied.

Here is the Background Summary section of Rivera's current motion:

> Rivera plead guilty to one count of a narcotics conspiracy, in violation of Title 21, U.S.C. Section 846. At sentencing pursuant to the Government's invocation of § 2A1.1 First Degree Murder Guideline and Application Note 1 Rivera was sentenced to a 240 month term of imprisonment and a five (5) year term of supervised release.
> At no time was Rivera charged with or plead guilty to a charge of Murder in any degree. Neither the Appendix A-Statutory Index or § 2D1.1(d)(1) cross reference supports a guideline sentence for a conviction under 21 U.S.C. § 846.

But what that summary fails to state is that Rivera was sentenced pursuant to a Fed. R. Crim. P. ("Rule") 11(e)(1)(C) plea

agreement that expressly took into account the fact that he -- despite the appalling and brutal nature of the conduct that he directed and in which he participated actively[1] - did not intend to cause the death of the victim, so that the life imprisonment term that is directed by Sentencing Guideline ("Guideline") § 2A1.1 in first-degree murder cases did not apply.

In that respect Paragraph 14 of Rivera's negotiated plea agreement is self-explanatory:

> 14. At the time of sentencing, the government shall move the Court, pursuant to Sentencing Guideline 2A1.1, Application Note 1, to depart from the applicable sentencing guidelines range, and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court. However, this Plea Agreement is governed, in part, by the Federal Rule of Criminal Procedure 11(e)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons within the Guideline range for an offender whose adjusted offense level is 37 and whose criminal history category is category II. The parties have reached this agreement by reference to Guidelines Section 2A1.2 (Second Degree Murder), or the Guideline penalty for the underlying conduct. The parties agree that while defendant acted knowingly in beating and causing the beating of the victim, he did not intend to cause the death of the victim. Guideline Section 2A1.2 provides for a base offense level of 33. At the time

---

[1] Although both Rivera and this Court are familiar with his conduct that led to the long-term sentence in this case, the possibility that he may choose to appeal from this memorandum order makes it appropriate to attach as Ex. 1 to this memorandum order the government version of the offense (Rivera essentially acknowledged the accuracy of that version by including a similar factual account in his plea agreement), to reflect the matrix in which this Court decided to accept the agreed-upon guilty plea.

2

of sentencing, the government will move for a downward
departure from the base offense level provided for by
Guideline Section 2A1.1, which is level 43 to level 34,
which is one level above the base offense level
provided for by Guidelines Section 2A1.2. When this is
raised by 2 levels for restraint of victim; raised
again by 4 levels for organizer or leader of criminal
activity involving give or more persons; and reduced by
three levels for acceptance of responsibility (see par.
6 above), the resulting adjusted offense level is level
37. The Guidelines range for a defendant found to have
an adjusted offense level of 37 and a criminal history
category of II is 235-293 months. At the time of
sentencing, the government will recommend a sentence
within this range, and the defendant will have the
right to argue for a sentence at the low end of this
range. The resulting sentence will be above the
Guideline range and the mandatory minimum penalty for
the underlying conduct. See Guideline Section
2D1.1(c)(6), and par. 8, above. Other than imposing a
sentence within the agreed range, the parties have
agreed that the Court remains free to impose the
sentence it deems appropriate. If the Court accepts
and imposes a sentence within the agreed range, the
defendant may not withdraw this plea as a matter of
right under Federal Rule of Criminal Procedure 11(e)(2)
and (4). If, however, the Court refuses to impose a
sentence within the agreed range set forth herein,
thereby rejecting the Plea Agreement, or otherwise
refuses to accept the defendant's plea of guilty, this
Agreement shall become null and void and neither party
will be bound thereto.

It is of course well-established that an actual intent to cause death is not an essential element of second-degree murder, for recklessness of the type that was evidenced by Rivera's conduct would readily suffice for such a conviction. This Court therefore found that the plea agreement properly called Guideline § 2A1.2 into play (and it remains of that view), so that Rivera's current statement that he did not "plead guilty to a charge of Murder in any degree" may be literally true as to the charge of

3

conviction, but it is disingenuous in terms of the proper triggering of the second degree murder Guideline.

Accordingly, at the sentencing hearing this Court accepted the Rule 11(e)(1)(C) plea and sentenced Rivera to 240 months' imprisonment, close to the bottom of the applicable Guideline range. In short, nothing in any action taken by the Sentencing Commission by way of an amendment effective November 1, 2000 supports Rivera's current effort to back out of his negotiated plea agreement and the sentence that was imposed in compliance with that agreement. As stated at the outset, his current motion is denied.

                                                _____
                                                Milton I. Shadur
                                                Senior United States District Judge

Date: February 1, 2001

# Memorandum



DEC 2 1 1994
Rec USPO
[signature]
Lewis

| Subject | Date |
|---|---|
| <u>United States v. Ricardo Rivera</u><br>No. 94 CR 280-1<br><u>Government's Sentencing Memorandum</u> | December 2, 1994 |

| To | From |
|---|---|
| SHEILA LALLY<br>U.S. Probation Office | WILLIAM D. SHAVER<br>Assistant U.S. Attorney |

I. **GOVERNMENT'S OFFICIAL VERSION OF THE OFFENSE**

A. **The Offense and Plea**

On August 10, 1994, the Special April 1993 Grand Jury returned a one-count indictment charging defendant Ricardo Rivera ("Rivera") and four codefendants with conspiracy to possess with intent to distribute and to distribute mixtures containing cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code Section 846.

On November 17, 1994, Rivera pleaded guilty to the indictment pursuant to a plea agreement. District Judge Milton Shadur took Rivera's guilty plea under advisement and ordered a presentence investigation report.

B. **Government's Version of the Facts**

From August until November 1992, Rivera, along with co-defendants Billy Bell ("Bell"), William Perez ("Perez"), Dennis Redding ("Redding") and Justo Ruiz ("Ruiz"), all residents of Milwaukee, Wisconsin, took part in a conspiracy, primarily based in Milwaukee, to distribute kilogram quantities of cocaine.

Sometime in the summer of 1992, Rivera, the leader and organizer of the narcotics conspiracy charged, began to associate with Ruiz, Perez, Bell, Redding and a number of juveniles, all of whom resided in the same Milwaukee neighborhood. Rivera, a former Spanish Cobra gang member who was now dealing cocaine, told Ruiz and the others that he wanted to start his own "organization" that would deal in drugs and that he wanted all of them to be members. The gang would be called the "Hispanos." Rivera said that the Hispanos would be a "new mafia", well-respected among other existing street gangs and would be well armed. The Hispanos gang was then formed, with Rivera as its leader.

In August 1992, Rivera and the other Hispanos members took possession of a house located at 202 South 7th Street, Milwaukee, Wisconsin, which then became the Hispanos "clubhouse."

In order to obtain the clubhouse, which was conveniently located near the homes of each of the gang members, the gang, at Rivera's direction, drove out the family that was then living in the house through the use of intimidation. the house was then rented out by Rivera in the name of Dennis Redding. Redding was the only gang member who actually lived there. The other gang members would come by the house regularly, sometimes on a daily basis. Rivera supplied the gang house with a pool table and video games, as well as a large-screen television.

Rivera was the driving force behind the cocaine trafficking activities of the Hispanos. During the course of the cocaine distribution conspiracy charged, Rivera obtained on various occasions kilogram quantities of cocaine from his cocaine source, Jose Luis Lechuga ("Lechuga"), who was from Chicago, Illinois. Perez occasionally assisted Rivera in procuring the cocaine. Once they obtained the cocaine, Rivera, Perez, Redding and several of the juvenile Hispanos members would "cut" or dilute the cocaine and then package it for street sales, generally in quarter- gram bags. Once packaged, the cocaine was sold to drug users in Milwaukee. Redding was the Hispanos' principal cocaine distributor to users, selling the cocaine at several taverns located in Milwaukee. From approximately August through November 1992, Rivera and the Hispanos organization distributed a total of at least 5 kilograms but less than 15 kilograms of cocaine.

In early November 1992, Rivera told the other Hispanos gang members that he was dissatisfied with his drug supplier Lechuga. Rivera felt that Lechuga was overcharging him for cocaine and also felt that Lechuga was not treating him with the proper respect. Also, a dispute had arisen between Rivera and Lechuga over an unpaid drug debt. Because of the dispute, Rivera decided to abduct Lechuga and force him to reveal where he kept his drugs and money.

Subsequently, on at least two occasions prior to November 19, 1992, Rivera, along with other Hispanos members, went to the Los Tigres Tavern, 924 South Fifth Street, Milwaukee, a location Lechuga frequented, in an effort to abduct him. Lechuga could not be located on those days.

In the early afternoon of November 19, 1992, Rivera met with Perez, Ruiz, Bell, Redding and several juvenile Hispanos members at the Hispanos clubhouse and told them they were going to abduct Lechuga that afternoon from the Los Tigres Tavern. Rivera informed the other Hispanos members that Lechuga would have a large amount of cocaine (approximately two kilos) and a large amount of cash ($100,000.00 to $200,000.00) in his control that day. Rivera instructed the others that they were going to use two vehicles to travel to the Los Tigres Tavern and that, once there, Rivera would go inside the tavern and lure Lechuga outside. Once outside, Bell, Ruiz and one of the juvenile Hispanos members were to grab Lechuga

2

and throw him in one of the cars. The rest of the Hispanos were to act as lookouts during the abduction.

After laying out the plans for Lechuga's abduction, Rivera directed the gang members to arm themselves. Rivera had previously placed baseball bats and firearms on the clubhouse pool table prior to the meeting and these were the weapons used by the gang members during the abduction.

At approximately 4:30 p.m., Rivera and the other Hispanos got into the car and van and drove to the Los Tigres Tavern. Upon their arrival, all the Hispanos members got out of the two cars. Rivera then went alone into the Los Tigres Tavern while Ruiz, Bell and the juvenile gang members positioned themselves near the tavern's entrance. The remaining Hispanos members stood nearby. A short time later, Rivera came out of the tavern in the company of Lechuga. Once Rivera and Lechuga walked out, Bell, Ruiz and the juvenile began to chase down Lechuga, and Ruiz struck Lechuga at least once with a baseball bat. Lechuga continued to run and eventually ran on top of a car that was driving through a rear alley near the tavern. The gang members, who displayed firearms to ward off any intervention by passersby, were ultimately able to subdue Lechuga, who was then handcuffed and pushed into the back of the van. While in the van, Lechuga's eyes were covered with duct tape. All the Hispanos members then got back into the two cars and drove back to the gang's clubhouse.

Once at the clubhouse, Lechuga, at Rivera's direction, was taken out of the van, dragged into the clubhouse and then pushed down the stairs into the basement. Rivera, Perez, Bell, Ruiz, Redding, and the juvenile Hispanos members all went down into the basement. Once there, Rivera told Perez that he and one of the juveniles should move the cars that were used in the abduction and told Redding to go upstairs to stand guard. Redding then went upstairs and Perez and the juvenile left and relocated the cars to Perez' house. After moving the cars, Perez returned to the clubhouse and again went down to the basement. The juvenile did not return to the clubhouse.

In the basement, Lechuga's wrists and ankles were bound with extension cords and duct tape (The handcuffs originally placed on Lechuga outside of Los Tigres had broken when Lechuga was pushed down the stairs into the basement of the clubhouse) and Rivera began interrogating Lechuga about where he kept his cocaine and cash. While Rivera questioned Lechuga, Bell and Ruiz and one of the juveniles, at Rivera's direction, used a baseball bat to repeatedly strike Lechuga on various parts of his body in an effort to get Lechuga to reveal where he kept his money and drugs. While being interrogated by Rivera, Lechuga repeatedly screamed and begged for mercy. Eventually, Lechuga told Rivera that two kilos of cocaine and either $100,000.00 or $200,000.00 in cash was stored in a car parked near the Los Tigres Tavern. Rivera persisted in

3

his questioning in an effort to get further details about this car. Lechuga continued to be beaten and to scream and beg for mercy. When Lechuga would not quiet down, Rivera had one of the gang members wrap tape around Lechuga's mouth in an effort to quiet him. Some of this tape may have also covered Lechuga's nose. A few minutes after the tape was applied to Lechuga's mouth, Lechuga stopped struggling. After Lechuga stopped struggling, the gang members thought Lechuga had suffocated due to the tape around his head. At this time, Perez, who, along with Redding had not taken part in Lechuga's beating, panicked and suggested Lechuga should be given CPR. Bell, in response, walked over to Lechuga, stomped on his chest and said "there's his fucking CPR."

Rivera then directed other Hispanos members to drag Lechuga into another part of the basement, where his body remained for a brief period. A few minutes later, Lechuga was dragged back up the basement stairs, at Rivera's direction, and placed into the trunk of a 1970 Oldsmobile Cutlass (The Cutlass was owned by Rivera, but Rivera let Perez use it on a continuous basis during the period of the conspiracy). Rivera then instructed Ruiz, Bell, and two of the juvenile Hispanos members to drive Lechuga's body to Illinois and dump it. Rivera instructed Ruiz to drive the car because he was the only one among the four who had a driver's license. Rivera also told Ruiz that should he get stopped by the police, the police would not be able to search the trunk without a search warrant.

Ruiz, with Bell and the two juveniles in the car, then drove the Oldsmobile with Lechuga's body out of Milwaukee and headed for Illinois. After crossing the Wisconsin-Illinois state line, the four gang members decided they had driven far enough from Milwaukee. Ruiz then got off the Illinois tollway and drove until coming to a deserted dirt access road near Gurnee, Illinois. The four gang members then removed Lechuga's body from the trunk of the car and left it near the dirt access road. After dumping Lechuga, the four gang members then returned to Milwaukee.

Approximately two days later, Rivera warned the gang members that none of them should talk about the kidnapping and murder of Lechuga. Rivera threatened to kill the other gang members and their families should they talk to the authorities.

Lechuga's body was discovered by a passerby on November 26, 1992. The subsequent autopsy revealed a two-fold cause of death: Severe multiple blunt trauma and acute cocaine intoxication from an apparent forced injection of cocaine, either of which, by itself, would have been lethal.

4